**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO  DIVISION**

NANCY JACOBINI,

         Plaintiff,

   v.

J.P. MORGAN CHASE, N.A, LPS FIELD
SERVICES, INC., FULL STUFF, INC.,
TRUST FIELD SERVICES, LLC, YEHUDA
MARKOVITZ  and FABIAN RIFICI.

        Defendants.

Case No. 6:11-cv-00231-GAP-GJK-Sr

**PLAINTIFF'S SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.      Nancy Jacobini, a single woman and Florida homeowner files this case to pursue redress for Chase Bank breaking into her occupied home twice prior to the filing of a foreclosure or obtaining a court order of any kind. On September 28, 2010, Ms. Jacobini was sitting in her home alone.  She heard someone at the front door trying to break into her house, locked herself in the bathroom and immediately called 911.  The Orange County Sheriff's Office arrived, apprehended the intruder and soon learned that the intruder was a contractor sent by her bank to "secure" her home. On April 21, 2011, after filing the instant federal lawsuit against Chase, a second break-in occurred while Ms. Jacobini was home and resulted in a second frantic 911 call to the police that resulted in a subsequent trip to the emergency room to address the elevated heart rate, panic and elevated blood pressure Ms.

Jacobini experienced after this second intrusion.

2.      To remedy the damage caused by the defendants and to prevent future break-ins, the plaintiff brings the following claims: 1) trespass; 2) the intentional infliction of emotional distress; 3) breach of contract; 4) breach of the duty of good faith and fair dealing; 5) invasion of privacy and 6) violations of the Fair Debt Collection Practices Act.

<u>**PARTIES**</u>

3.      The plaintiff, Nancy Jacobini lives at 12531 Newfield Drive, Orlando, Florida 32837, located in Orange County, Florida.

4.      The defendant J.P. Morgan Chase, N.A. ("Chase") is a corporation headquartered at 270 Park Avenue, New York, New York.  J.P. Morgan Chase, N.A. recently merged with Chase Home Finance LLC ("CHF"), a former subsidiary of Chase, who had been corresponding with the plaintiff regarding a mortgage encumbering her property.  As part of its core business, CHF regularly pursues collection, the pre-foreclosure securing of homes and foreclosure on loans it services for lenders and investors.

5.      The defendant LPS Field Services, Inc. (LPS) is a corporation doing business in Florida with a principal place of business of 30825 Aurora Road, Solon, Ohio whose core business is inspecting and securing properties for mortgage servicers for a fee through its national network of inspectors and contractors.

6.      The defendant Full Stuff, Inc. ("Full Stuff") is a company incorporated in Florida with a principal place of business at 12701 S. John Young Pkwy., Suite 212 , Orlando, FL 32837.  Full Stuff is a subcontractor who is often hired by LPS to deliver notices known as "door cards", inspect and secure properties for LPS and mortgage servicers.

7.      The defendant Trust Field Services, LLC ("Trust Field Services") is a company incorporated in Florida with a principal place of business of 20193 N.E. 16th Street, Miami, FL 33179.  Trust Field Services is a subcontractor who is often hired by LPS to conduct property inspections, lock changes, and other so-called property preservation services for mortgage servicers and LPS.

8.      Yehuda Markovitz ("Markovitz") is an individual who was employed by Defendant Trust Field Services  and resides in New York.

9.      Fabian Rifici ("Rifici") is an independent contractor of Defendant Full Stuff who resides in Orlando, Florida and provided property inspection services for Full Stuff.

## JURISDICTION AND VENUE

10.      This court has subject matter jurisdiction over all defendants, with the exception of Chase, pursuant to the federal Fair Debt Collection Practices Act.  The Court has pendant party jurisdiction over Chase pursuant to 28 U.S.C. 1367(a) as the claims against Chase arise from the same nucleus of operative facts and involve the same evidence and witnesses. Moreover, Chase is an essential part of this case or controversy as it is the entity which purports to own the plaintiff's loan, serviced the plaintiff's loan and distributed work orders to the other defendants.  All of the defendants have availed themselves to jurisdiction here as they have directly conducted business in Florida or provided services here.  Venue is proper as the plaintiff resides here, her home is located here and the gravity of facts and/or circumstances contained in the Plaintiff's Second Amended Complaint happened in this County.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

11.      The plaintiff has lived in her home in Orlando, Florida for fifteen (15) years.  She

is single and lives alone.  The home has, at all relevant times, been well maintained, permanently

occupied, fully furnished and secured by locks, a security chain and an offsite burglary and

emergency alarm system. Ms. Jacobini works during weekdays and regularly comes home to her

house after work each day.

Ms. Jacobini's Loan, Her HAMP Loan Application and the Two Home Intrusions

12.     Ms. Jacobini currently has a loan and mortgage on her home. Chase claims to be

the current holder of her mortgage and the loan appears to have been serviced in the past by

CHF.

13.     However, the purported, recorded Assignment of the mortgage indicates it was

signed on November 23, 2010 with a *retroactive effective date of September 16, 2010*.  The

purported Assignment was a MERS assignment, it was not recorded until January 20, 2011 and it

was drafted by the troubled law firm Ben-Ezra & Katz, P.A., with whom both Fannie Mae and

Chase have ceased doing business.

14.     The Assignment itself has mistakes on its face as it has the "assignee" assigning

the mortgage to the "assignee."

15.     The recorded Assignment demonstrates that Chase's interest in the mortgage, and

its security interest in the property, had not arisen, if at all, until November 23, 2010, after the

majority of the events at issue took place.

16.     In 2010 Ms. Jacobini fell behind on her mortgage payments due to the loss of her

job.  During all relevant times, Chase had not filed any foreclosure proceedings against the

subject property and the plaintiff had not been served with a foreclosure lawsuit or a court order

of any kind.

17.     On or about March 31, 2010 she was a few months late on her mortgage when Chase solicited Ms. Jacobini by letter indicating that she may be eligible for a loan modification through the federal Home Affordable Modification Program ("HAMP") to which Chase is a participating lender.

18.     Ms. Jacobini hired the loan modification company American Home Plan to assist her with her HAMP application. On May 11, 2010 Chase confirmed receipt of Ms. Jacobini's authorization to deal directly with American Home Plan.

19.     By June 15, 2010 Chase had been in direct contact with American Home Plan. On or about June 17, 2010, American Home Plan faxed Chase a fax cover sheet with 26 pages of requested documents, comprised of the plaintiff's HAMP application and supporting documents. The HAMP application expressly stated that the plaintiff was living at her house.

20.     On June 21, 2010, Chase acknowledged receipt of the paperwork.  From June 23 through July 23, 2010, Chase sent the plaintiff various correspondence regarding her loan modification.   On July 23, 2010, Chase sent the plaintiff a letter indicating that it needed paperwork regarding her application for a loan modification.  Chase had apparently misplaced or lost the previously submitted documents.

21.     On or about August 2, 2010 American Home Plan sent Chase two faxes.  The first fax of 20 pages once again sent Chase supporting documents.  The second fax of three pages indicated the following: "Client is so confused because we have been sending all docs.  Is there anything else?"

22.     On August 18, 2010, Chase sent Ms. Jacobini a letter denying her loan modification which stated in relevant part: "Your HAMP has been denied.  A notice which listed

specific documents was send to you more than 30 days ago.  You did not provide us with documents requested . . . You have 30 days to discuss the reasons for non-approval . . . No foreclosure sale will be  conducted and you will not lose your home during this 30-day period."

23.    Chase had been sending all of these letters to the plaintiff at her home and the plaintiff had been responding to the letters through American Home Plan.  Chase was well aware at this time that the plaintiff was residing in her home and attempting to gain approval for a HAMP loan modification.

24.    On September 22, 2010, American Home Plan sent Chase another fax regarding Ms.  Jacobini's  loan  modification  application  which  contained  nine  more  pages  of documentation.

25.    Under HAMP, a participating lender cannot foreclose until the HAMP program has been certified as completed.

26.    On September 28, 2010 she arrived home from work. While in her house, she heard someone trying to break into her house through the front door. Her home alarm went off.

27.    She locked herself in her bathroom and called 911 on her cell phone.  While in her bathroom she could hear the intruder break in through the front door and enter her house. The horror and fear in her voice is plainly evident in the tape recording of the 911 call.

28.    For approximately fifteen (15) minutes she remained on the telephone with the police in fear for her life.  The police arrived, apprehended the intruder and cleared her house so that it was safe for her to come out of her bathroom.

29.    The front door deadbolt and door knob lock had been drilled out with a power drill and the privacy chain  to the front door had been cut off with a large bolt cutter by the time

the police arrived.

30.     The intruder turned out to be defendant Yehuda Markovitz, an employee of defendant Trust Field Services, who had been sent to the home on behalf of Trust Field Services, Chase and LPS to change the locks in a pre-foreclosure, self-help attempt to "secure" the property.

31.     Despite possessing no Assignment of Ms. Jacobini's mortgage and Chase's constant contact with Ms. Jacobini and American Home Plan regarding Ms. Jacobini's application for a loan modification, Chase, LPS and Trust Field Services claimed that Ms. Jacobini's home was "unoccupied" and therefore they had the right to drill out her locks and cut the privacy lock with a bolt cutter and replace it with their own lock which would allow their long list of contractors easy access to Ms. Jacobini's home with the standard key codes.

32.     At all relevant times, the house was occupied, fully furnished, the utilities were on, Ms. Jacobini lived in the home and she was communicating with Chase on a regular basis about applying for a loan modification.   Moreover, Chase had been sending letters to the plaintiff's home which she and American Home Plan had been responding to.   The plaintiff received no advance notice whatsoever regarding the break in.

33.     While on scene, the police asked the contractor to install locks on the door to properly secure it. The defendant's contractor installed new locks and gave the plaintiff the keys.

34.     Neither Markovitz, Trust Field, LPS or Chase ever informed the plaintiff that the new lock installed on her door was master keyed which permitted any of LPS' numerous subcontractors access to her home with a universal key.   After the break-in, her house was far less "secure" than before the break-in.

35.     After the first break-in, out of fear for her own safety, Ms. Jacobini moved a large piece of furniture against her front door in hopes of blocking future intruders from gaining access to her home.

36.     On April 21, 2011, while this instant lawsuit was pending, Ms. Jacobini was at home in the afternoon when she heard something at the location of the front door. As she approached the front door area to her home the door was suddenly opened which triggered her alarm and moved the front door up against the large piece of furniture. She immediately called 911.  The intruder, again a  contractor for Full Stuff named Fabian Rifici, had breached the front door.

37.     Ms. Jacobini was overwhelmed and broke down in tears while on the 911 call with the police.  Due to her panic and anxiety she was subsequently transported to the hospital where she received medical treatment for her elevated heart rate and anxiety.

38.      After the incident she learned that Rifici had used a universal key to open the lock.  During the entire seven month period between the first and second lock-outs, the bank's lock was on Ms. Jacobini's door and an undetermined number of individuals and bank contractors had the ability to enter her home using a universal key.

39.      Ms. Jacobini's sense of security in her home, which had been devastated by the first break-in, was shattered by the second break-in.  In addition to keeping furniture in front of her front door, she has posted "No Trespassing" signs on her property and now usually parks her car outside, instead of in her garage.

**The Actions of Chase and Its Contractors Leading Up to the Break-Ins**

**Home Inspection Practices and HUD Reimbursement**

40.     As a matter of course and practice, Chase orders home inspections and other services from defendant LPS when it believes a borrower is behind on payments.  Chase's home inspections are allegedly ordered to determine if a home has been abandoned and, if so, a lock-out is ordered allegedly to secure Chase interest in its collateral.

41.     LPS, in turn, subcontracts Chase's work orders to its network of local Florida contractors.  LPS uses both Full Stuff and Trust Field Services as two of its Florida contractors.

42.     Full Stuff subs the work out even further to "independent contractors", such as defendant Fabian Rifici.  Trust Field Services uses employees to perform the lock changes and other work orders sent to them by LPS.

43.     The work orders are sent from Chase down to LPS and then from LPS to the other contractors.  The return inspection reports, where information is entered directly into LPS' form inspection report (along with attached pictures of the property), are sent back through LPS to Chase. This permits the opportunity to verify and analyze the work orders and photographs asserting any work orders on a borrower's home.

44.     On federally insured loans, Chase, as a matter of course and practice, submits the expenses for inspections and lock-outs for reimbursement to HUD or FANNIE MAE as part of its claim procedures.  Chase, as well as each contractor in the chain, marks up the cost of the actual service performed at the homeowner's property before it is submitted to HUD or FANNIE MAE.  Chase then charges borrowers for the cost of the inspection and lock-out.

45.     Neither Chase, LPS, Full Stuff or Trust Field Services trained the contractors and inspectors involved on the applicable HUD or FANNIE MAE regulations, a homeowner's right to possession under the mortgage and/or Florida law or on methods to determine if a home is

abandoned.   Moreover, Chase's, LPS's, Full Stuff's and Trust Field Services' limited procedures, which consist merely of a form "check the box" work order,  are only designed to note if a home is unoccupied or vacant, not if it is, in fact, abandoned as required by most mortgages.

46.     As a matter of course and practice, LPS, Full Stuff and Trust Field Services conduct their inspections on weekdays during work hours when homeowners are typically at work or away from home.

47.     The average time for a Full Stuff "independent contractor" to conduct an inspection and to gather information to determine whether a property is "vacant", "occupied", "abandoned" or "secured" is two (2) minutes.  Full Stuff conducts numerous inspections per month and is paid a set fee by LPS for each inspection.

48.     Full Stuff pays its "inspectors" an even smaller fee per inspection.  Full Stuff claims that its inspectors are "independent contractors."

49.     Full Stuff had complained to LPS that for the time they were given to perform an inspection and the price they were paid for the inspection, it was insufficient to do a full and complete analysis and inspection to see if there was occupancy .

50.     LPS's response to Full Stuff's complaints has been to "take it or leave it."

51.     None of the inspectors who were sent to Ms. Jacobini's home had any prior experience in the property preservation industry, inspecting homes including the determination of "occupancy", "vacancy", or "abandonment". All of the inspections conducted at Ms. Jacobini's home were conducted by untrained inspectors who, on average, spent two minutes at her home and were paid a nominal sum for the inspections.

52. Based on a two minute inspection, these untrained inspectors made (and make) determinations as to whether a home is occupied or abandoned for the purpose of Chase taking the extreme self-help remedy of seizing a home and changing the locks thereby denying possession and access of a homeowner there property and possessions. Trust Field Services has indicated that in many instances the determination that a home is abandoned is wrong and the contractors are called back to the property to remove their locks.

### The Inspections of Ms. Jacobini's Home

53. Chase started ordering inspections on Ms. Jacobini's property on or about September 8, 2009 and conducted what appeared to be six inspections, with the last inspection on September 23, 2010, just five days before the first intrusion and lock drilling. For each of these inspections, Chase sent work orders to LPS who, in turn, subcontracted the work to Full Stuff. Full Stuff subcontracted the inspections to a series of five different independent contractors who were friends or related in some way to Full Stuff's corporate president, Angel Arias.

54. Based on testimony from Angel Arias, these inspections averaged two minutes each. Chase's first inspection order was for an exterior "initial secure" allegedly to determine if the home was occupied and secure. After receiving the order from LPS, Full Stuff's inspector conducted an inspection on or about September 13, 2009. On the issue of vacancy, the inspector equivocally checked off on the inspection form both "vacant – secure" and "by unknown occupant." The inspectors report indicates that the electricity was on and the grass was over a foot high. The document produced by Chase in discovery pertaining to the same inspection indicates "vacant – secure" "no electric, water, (gas unknown)", grass over 1 foot.

55.     For the second inspection and all subsequent inspections, LPS sent partially completed work orders to Full Stuff, as certain boxes on its inspection report reply form were already filled in by LPS.  For example, if a prior inspection indicated that the property had been determined to be vacant, that information was included on the form.

56.     For March 19, 2010 second inspection, Full Stuff's inspector reported the property as "vacant – secure" with electric and water on. Full Stuff has photographs showing the water and electric meter reading . The "pre-printed checkmarks " on the work order form of LPS have a check mark in the "no" section pertaining to electricity and water. The document produced by Chase in discovery pertaining to the same inspection indicates "vacant – secure" "no electric, water, (gas unknown)", grass under 1 foot.

57.     For the third inspection on June 17, 2010, LPS requested an "interior and exterior" inspection where Full Stuff could enter Ms. Jacobini's home.  Full Stuff reported it did not enter because the key did not work.  The Full Stuff inspection report indicates the electricity was on and verified by the meter and that the water was on. The "pre-printed checkmarks" on the work order form of LPS are scratched out but also appear to have a check mark in the "no" section pertaining to electricity and water. Again a document produced by Chase  concludes the property is "vacant – secure" with no electric or water, despite the photographs from the inspector showing that the electrical meter is running and has a digital reading.

58.     On June 21, 2010, documents produced by Chase indicate a grass cut review was done and there was a determination made that the property was "occupied."

59.     The fourth inspection requested by LPS was for another interior and exterior inspection where Full Stuff again concluded on August 17, 2010 that the property was "vacant –

secure" but occupied by an "unknown occupant."  . The Full Stuff inspection report showed the electricity and water  as "on" as evidenced by photographs showing an electrical meter reading higher than the reading in the previous inspection report.  The inspection report also indicates: "maybe house is occupied." The "pre-printed checkmarks " on the work order form of LPS  have a check mark in the "no" section pertaining to electricity and water. A document produced by Chase  concludes the property is "vacant – secure" with electric  and water and references that there is personal property inside the home.

60.     For the last inspection on September 23, 2010 just five days prior to the first break-in, a document submitted by Chase references that an "interior/exterior" inspection had been ordered but could not be done because the locks had not yet been changed.  There is no mention in Chase's or LPS's orders that the prior inspection report expressly stated that the house may be occupied.

61.     The September 23, 2010 inspection report once again indicates the property is "vacant – secure" despite the rest of the report showing otherwise.  The report indicates that the electric and water are both on and did not recommend that the grass needed cutting which indicates that the grass had been cut.  The inspection photographs also show a trash barrel placed at the curb for garbage pick-up that had not previously been there, an  electrical meter reading higher than previous readings, a fully furnished living room and water flowing from an outside faucet. A document produced by Chase  concludes the property is "vacant – secure" with electric and water on and references that "grass look cut".

62.     During the entire time period of the inspections, Ms. Jacobini was living at her

home.   Neither her electrical service nor her water had ever been shut off and she was using it.

63.     At all times her home was fully furnished, maintained by her and secured with locks and a security system.

64.     As early as May 11, 2010 and up until the first break-in, she and/or American Home Plan were in repeated contact with Chase regarding Ms. Jacobini's application for a loan modification and Chase knew she lived at her house.

65.     The inspection reports and inspection photographs were provided to LPS by Full Stuff via LPS's online reporting system.   In turn, LPS provided the inspection reports and photographs to Chase.

66.     Full Stuff recklessly failed to conduct adequate inspections to determine whether, in fact, Ms. Jacobini's home had been abandoned and used a series of different inspectors for the majority of the inspections.

67.     LPS and Chase repeatedly failed to adequately review the inspection reports and inspection photographs provided to them by Full Stuff which demonstrated that Ms. Jacobini was living in her home.  Full Stuff, LPS and Chase all knew from information they possessed and had control of and access to that Ms. Jacobini lived in her house.   Despite this knowledge, they recklessly proceeded to break into her home, twice.

68.     In addition to the inspection reports and inspection photographs, Chase had direct knowledge from its handling of Ms. Jacobini's loan modification application that was living in her home.

69.     At no point in time did any defendant call Ms. Jacobini to verify if she  lived at her house or send her a letter, certified or otherwise, asking about the occupancy of her home.

Rather than simply ask Ms. Jacobini if she still lived in her home, the defendants conducted unnecessary and intrusive inspections and changed locks which were up-charged from each contractor to Chase who eventually charged FANNIE MAE, HUD and/or the plaintiff for these inflated service fees in violation of her mortgage.

## COUNT 1
### Trespass
### (Vicarious Liability As to All Defendants)

70.     The Plaintiff re-alleges the above paragraphs as if fully set forth in this Count.

71.     The defendants, their agents, contractors and/or employees entered the plaintiff's property without permission, authorization or the legal right to do so.

72.     The defendants, their agents, contractors and/or employees had not filed for foreclosure at the time of the breaking and entering, nor had they obtained a court order authorizing access to the plaintiff's home.

73.     The actions of the defendants, their agents, contractors and/or employees were done negligently and/or with gross disregard for the rights of the plaintiff.

74.     The plaintiff was damaged as a direct and proximate result of the actions of the Defendants, their agents, contractors and/or employees.

WHEREFORE, the plaintiff requests judgment in her favor on this Count and further requests that she be awarded damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs and pre-and post-judgment interest on any award.

## COUNT 2
### Intentional Infliction of Emotional Distress
### (As to All Defendants)

75.     The plaintiff re-allege the above paragraphs as if fully set forth in this Count.

76.     The defendants, their agents, contractors and/or employees entered the plaintiff's property and house without permission or authorization.  At the time of the first break-in, Chase had not yet obtained an Assignment of the plaintiff's mortgage.  The Assignment it purportedly obtained on November 23, 1010 and did not record until January 20, 2011 has the indicia of being created after the fact for the purposes of litigation.

77.     The defendants, their agents, contractors and/or employees broke into the Plaintiff's home without instituting foreclosure proceedings, obtaining a court order and/or providing sufficient and adequate notice.  The defendants had no legal right to enter the plaintiff's home.

78.     In addition, the defendants have produced pictures from their inspection reports which show that the defendants were using cameras to take pictures of the inside of the plaintiff's house apparently through windows.

79.     The defendants' acts and/or omissions were done intentionally and/or with reckless disregard for the safety of the plaintiff creating an unreasonable risk of emotional distress.  The defendants' conduct was such that it was certain, or substantially certain, to result in emotional distress.

80.     The acts and conduct of the defendants, their agents and contractors were extreme and outrageous.  The defendants are directly and/or vicariously liable for the actions of their agents, contractors and/or employees.

81.     As evident by the first tape of the 911 call, the plaintiff was locked in her bathroom fearing for her life while an intruder broke the lock to her front door and entered her

home.   The 911 tape evidences the plaintiff's hysteria and fear as she waits for the police to arrive and secure her home. Even after the police arrive, she is advised to remain locked in her bathroom while the police clear the house.   In the tape of the second 911 call the plaintiff recounts the second ordeal and breakdowns into tears on the call.

82.      In addition, after the first break-in, the bank kept its lock on her house which had a universal key whereby its contractors could enter Ms. Jacobini's house with a key.   During these incidents and continuing to the present, Ms. Jacobini is in fear for safety her while at home and her sense of security in her home has been shattered.

83.      After the second break-in, Ms. Jacobini was so anxious from the incident she sought medical treatment at a local emergency room.

WHEREFORE, the plaintiff requests judgment in her favor on this Count and further requests that she be awarded damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs and pre-and post-judgment interest on any award.

## COUNT 3
## Breach of Contract
### (As to Chase)

84.      The plaintiff re-alleges the above paragraphs as if fully set forth in this Count.

85.      The plaintiff entered into a loan and mortgage on her property which Chase now claims it owns.  The terms and conditions of the note and mortgage do not permit the holder to break into and enter the Plaintiff's home.     Moreover, the plaintiff's mortgage requires notice prior to an internal inspection.

86.      To the extent Chase owner the note and mortgage, it breached the terms and

conditions of the note and mortgage and the Chase's breach has caused the Plaintiff damages.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that she be awarded damages in an amount to be proven at trial, attorney's fees and costs and pre-and post-judgment interest on any award.

<u>**COUNT 4**</u>
**Breach of the Duty of Good Faith and Fair Dealing**
**(As to Chase)**

87.     The plaintiff re-alleges the above paragraphs as if fully set forth in this Count.

88.     The plaintiff entered into a loan and mortgage on her property which Chase now claims it owns.  The terms and conditions of the note and mortgage do not permit the holder to break into and enter the plaintiff's home.

89.     Moreover, the plaintiff's mortgage requires notice prior to an internal inspection.

90.     The defendant broke into and entered the plaintiff's home without first making meaningful and good faith attempts at notifying the plaintiff and/or determining if the home was occupied.  At the time of the defendant's break-ins, the defendant had the means and ability to contact the plaintiff by telephone and in writing to ask if the home had been abandoned.  In addition, there was substantial evidence that the home was occupied.  The property was well maintained, the utilities were on and the defendant had received no notice of any kind from the plaintiff that she had moved or otherwise changed her address.

91.     The defendant breached the duty of good faith and fair dealing inherent in the loan contract by breaking and entering into the plaintiff's home.  The defendant's breach has caused the plaintiff damages.

WHEREFORE, the plaintiff requests judgment in her favor on this Count and further

requests that she be awarded damages in an amount to be proven at trial, attorney's fees and costs and pre-and post-judgment interest on any award.

## COUNT 5
### Invasion of Privacy
### (As to All Defendants)

92.     The plaintiff re-alleges the above paragraphs as if fully set forth in this Count.

93.     The plaintiff owned and occupied her home.  She had a right to privacy in her home.  The plaintiff had the right to be free from unlawful intrusion onto her property and into her home.

94.     The defendants, their agents, contractors and/or employees broke into and entered the plaintiff's property and house without permission or authorization without a legal right to do so.

95.     In addition, the defendants have produced pictures from their inspection reports which show that the defendants were using cameras to take pictures of the inside of the plaintiff's house apparently through windows.

96.     At the time of the first break-in, Chase had not yet obtained an Assignment of the Plaintiff's mortgage.  The Assignment it purportedly obtained on November 23, 1010 and did not record until January 20, 2011 has the indicia of being created after the fact for the purposes of litigation.

97.     The defendants are directly and/or vicariously liable for the actions of their agents, contractors and/or employees.

98.     As described above, the actions of the defendants, their agents, contractors and/or employees were done intentionally and/or with gross disregard for the rights of the plaintiff and

constituted an invasion of the plaintiff's right to privacy.

99.     As evident by the first tape of the 911 call, the plaintiff was locked in her bathroom fearing for her life while an intruder broke the lock to her front door and entered her home.  The 911 tape evidences the plaintiff's hysteria and fear as she waits for the police to arrive and secure her home. Even after the police arrive, she is advised to remain locked in her bathroom while the police clear the house.  In the tape of the second 911 call, the plaintiff breaks down into tears on the call.

100.     In addition, after the first break-in, the bank kept its lock on her house which had a universal key whereby its contractors could enter Ms. Jacobini's house with a key.  During these incidents and continuing to the present, Ms. Jacobini is in fear for safety her while at home and her sense of security in her home has been shattered.

101.     After the second break-in, Ms. Jacobini was so anxious from the incident she sought medical treatment at a local emergency room.

WHEREFORE, the plaintiff request judgment in their favor on this Count and further request that they be awarded damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs and pre-and post-judgment interest on any award.

### COUNT 6
**Violations of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1692a(6), 1692f(6)(A))**
**(As to Markovitz and Rifici and LPS, Full Stuff, Trust Field based on vicarious liability)**

102.     The plaintiff re-alleges the above paragraphs as if fully set forth in this Count.

103.     The above defendants are all in the business of providing property preservation services to lenders and loan servicers to secure rights in their mortgage collateral, i.e. a

borrower's home.   All of the above defendants have performed these services for lenders numerous times, in some cases performing thousands of such services per month.

104.    As part of these services the defendants provide interior and exterior inspections of the mortgaged collateral and/or perform lock changes where they and their clients determine it necessary to protect the lenders and/or servicers interest in the mortgage property.

105.    The defendants in the course of their work also leave "door hangers" and/or similar notices at the property.

106.    The lock changes require removal of the borrower's locks and entry into their home.   The interior inspections require physical entry into the borrower's home.

107.    Both the lock changes and the interior inspections are performed as non-judicial actions to effect dispossession or disablement of the mortgaged property. The lock changes and attempted lock changes are implemented by the defendants for their lender and servicer clients to secure and take possession of the mortgage collateral.

108.    Likewise, interior and attempted interior inspections are for the effect of the defendants securing the property for the lender or servicer.   Securing the property is the only basis under the note and mortgage for which a lender or servicer can enter the mortgaged property on a non-judicial basis in Florida.

109.    The act of leaving "door hangers" and other notices at the home is also a non-judicial act to effect disablement and/or dispossession of the property as its express purpose is to protect the lender's and/or servicers security interest in the mortgaged property.

110.    Pursuant to 15 U.S.C. §§ 1692a(6) and 1692f(6)(A), third parties enforcing security interests of lenders violate the Act if "there is no present right to possession of the

property claimed as collateral through an enforceable security interest."

111.    At all times relevant hereto, Chase ordered LPS to take actions with respect to the protection of its security interest in the plaintiff's property.  Those requests included changing the locks on the plaintiff's property, conducting interior inspections of the plaintiff's home and leaving notices at the plaintiff's house.

112.    LPS communicated those work orders to Full Stuff and Trust Field Services and subcontracted those servicers to those two entities.  LPS, Full Stuff and Trust Field Services, as property preservation companies whose principal or main job is to inspect and secure mortgage properties for lenders and servicers, are subject to the Act and vicariously liable for the actions of their agents, employees and subcontractors.

113.    On or about September 27, 2010 Trust Field Service's employee Yehuda Markovitz cut the plaintiff's front door lock off with a bolt cutter at the request of Chase, LPS and Trust Field Services in an effort to secure Chase's security interest in Ms. Jacobini's home.

114.    On or about April 20, 2011, Full Stuff entered onto the plaintiff's property and opened her front door with a contractor's master key at the request of Chase, LPS and Full Stuff in an effort to secure Chase's security interest in Ms. Jacobini's home.

115.    On at occasions during the LPS and Full Stuff efforts to inspect and secure the secured property for Chase, notice and/or door cards were ordered to be left at and were left at the property.  These notices, the contents of which the defendants have yet to produce, constituted acts "threatening" to take non-judicial actions against Chase's security interest as defined under the Act.

116.    The actions taken in the three preceding paragraphs constituted acts to effect

dispossession and/or disablement of the plaintiff's right in her property.

117.    The defendants had no present right to possession of the Ms. Jacobini's property based on the mortgage documents or Florida law as she occupied the home, Chase and the defendants, LPS, Full Stuff and Trust Field Services knew she occupied the home and proceeded to enforce Chase's security interest.  The defendants are strictly liable for said violations of the Act based on vicarious liability.

WHEREFORE, the plaintiff request judgment in their favor on this Count and further request that they be awarded damages in an amount to be proven at trial, any and all additional damages allowed for by the Act, attorney's fees and costs and pre-and post-judgment interest on any award.

## COUNT 7
### Violations of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1692a(6), 1692f(6)(A))
### (As to LPS, Full Stuff and Trust Field on a direct liability basis)

118.    The plaintiff re-alleges the above paragraphs as if fully set forth in this Count.

119.    As alleged in the previous paragraph, LPS, Full Stuff and Trust Field services all gave the direct orders for their employees, agents and/or subcontractors to conduct the lock-out, inspection and notice services described in the previous paragraph which were all an attempt to enforce Chase's security interest in its collateral.

120.    LPS, Full Stuff and Trust Filed services all knew or should have known that the plaintiff lived in her house, the house had not been abandoned and there was no present right for Chase to take the acts described above to secure its collateral interest in the plaintiff's property.

121.    Despite this knowledge, the defendants still ordered its employees, agents and/or subcontractors to take these described actions to secure Chase's security interest in its collateral.

Said acts or ordering that these be performed constitutes a separate basis for liability under the Act.

WHEREFORE, the plaintiff request judgment in their favor on this Count and further request that they be awarded damages in an amount to be proven at trial, any and all additional damages allowed for by the Act, attorney's fees and costs and pre-and post-judgment interest on any award.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON THIS MATTER**

Respectfully submitted
On behalf of the Plaintiff,

/s/Matthew Weidner
_____
Matthew Weidner, Esq. TRIAL COUNSEL
Matthew D. Weidner, PA
1229 Central Avenue
St. Petersburg FL 33705
727-894-3159
727-213-62356 (fax)
widener@mattweidnerlaw.com


/ s /   Joseph F. deMello
_____
Joseph F. deMello
BBO# 546017
LAW OFFICE of JOSEPH F. deMELLO, P.C.
71 Main Street
Taunton, MA 02747
508-824-9112
508-824-5917 (fax)
josephdemellolaw@verizon.net

/ s / Carlin J. Phillips

_____

Carlin J. Phillips
BBO# 561916
PHILLIPS & GARCIA, P.C.
13 Ventura Drive
N. Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 (fax)
cphillips@phillipsgarcia.com

Dated: August 31, 2011


CERTIFICATE OF SERVICE

I, Joseph F. deMello, do certify that a copy of the within has been served via the E filing system to the attorneys of record in said system to:

Robert M. Brochin , Trial Counsel
Marisa Fortunati , Esquire
MORGAN, LEWIS & BOCKIUS LLP
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131-2339

Date:   August 31, 2011                   /s/ Joseph F. deMello

                                          _____

                                          Joseph F. deMello, Esquire